No. 22-1986

---

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

---

JILL HILE; SAMANTHA JACOKES; PHILLIP JACOKES; NICOLE
LEITCH; MICHELLE LUPANOFF; GEORGE LUPANOFF; PARENT
ADVOCATES FOR CHOICE IN EDUCATION FOUNDATION;
JOSEPH HILE; JESSIE BAGOS; RYAN BAGOS; and JASON LEITCH

Plaintiffs-Appellants,

v.

STATE OF MICHIGAN; GRETCHEN WHITMER, Governor, in her
official capacity; and RACHEL EUBANKS, Michigan Treasurer, in her
official capacity,

Defendants-Appellees.

---

Appeal from the United States District Court
for the Western District of Michigan
Docket No. 1:21-cv-00829
The Honorable Robert J. Jonker

---

**APPELLANTS' BRIEF**

John J. Bursch
Bursch Law, PLLC
9339 Cherry Valley SE, Suite 78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Patrick Wright
Mackinac Center Legal Foundation
140 West Main Street
Midland, Michigan 48640
(989) 631-0900
wright@mackinac.org

Attorneys for Plaintiffs-Appellants          Dated: January 23, 2023

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Sixth Circuit Rule 26.1, Plaintiffs-Appellants make the following disclosure:

1.      Is said party a subsidiary or affiliate of a publicly owned corporation?

Answer: No Plaintiff-Appellant is a subsidiary or affiliate of a publicly owned corporation.

2.      Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

Answer: No.

Dated: January 23, 2023          */s/ John J. Bursch*
                                 John J. Bursch
                                 Bursch Law, PLLC
                                 9339 Cherry Valley SE, Suite 78
                                 Caledonia, Michigan 49316
                                 (616) 450-4235
                                 jbursch@burschlaw.com

                                 Attorneys for Plaintiffs-Appellants

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................iv

STATEMENT REQUESTING ORAL ARGUMENT .............................vii

JURISDICTION ....................................................................viii

STATEMENT OF ISSUE FOR REVIEW ...............................................viii

INTRODUCTION...................................................................1

STATEMENT OF THE CASE ...............................................................4

    Factual background..........................................................4

        A.    Appellants seek public assistance for private,
religious-school tuition..................................................4

        B.    The antireligious origin of Blaine Amendments ...........4

        C.    The antireligious lead up to Michigan's Blaine
Amendment ..................................................................7

        D.    Michigan adopts a Blaine Amendment through
Proposal C .................................................................13

        E.    Michigan's Blaine Amendment restructured the
political process against religious persons ..................20

        F.    Michigan gives secular private schools an option
to receive public funds .................................................22

    Proceedings below ........................................................23

        A.    Appellants file their complaint, and the State
moves to dismiss it .......................................................23

B.    The district court grants the State's motion to dismiss ........................................................................ 24

SUMMARY OF THE ARGUMENT ....................................................... 25

STANDARD OF REVIEW ................................................................... 26

ARGUMENT ...................................................................................... 26

I.    The *Schuette* decision did not overrule the Supreme Court's political-process doctrine precedent ......................... 26

II.    The political-process doctrine applies to religious discrimination ........................................................ 32

III.    The Blaine Amendment's facial neutrality does not save it given the Michigan Supreme Court's holding that the Blaine Amendment was passed for antireligious reasons ............................................................ 35

IV.    The Blaine Amendment restructured Michigan's political system in a way that disadvantages religious people ...................................................................... 41

CONCLUSION AND REQUESTED RELIEF ........................................ 42

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Alexander v. Bartlett,*
165 N.W.2d 445 (Mich. Ct. App. 1968) .............................................. 10

*Ashcroft v. Iqbal,*
556 U.S. 662 (2009) ..................................................................... 26

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
508 U.S. 520 (1993) ................................................................. 35, 38

*City of New Orleans v. Dukes,*
427 U.S. 297 (1976) ..................................................................... 32

*Council of Organizations & Others for Education About Parochiaid, Inc. v. Engler,*
566 N.W.2d 208 (Mich. 1997) .................................................. 2, 20, 38

*Espinoza v. Montana Department of Revenue,*
140 S. Ct. 2246 (2020) ................................................................... 2

*Gordon v. Lance,*
403 U.S. 1 (1971) ......................................................................... 34

*Grutter v. Bollinger,*
288 F.3d 732 (6th Cir. 2002) ........................................................... 31

*Hohn v. United States,*
524 U.S. 236 (1998) ..................................................................... 31

*Hunter v. Erickson,*
393 U.S. 385 (1969) ........................................................ 27, 28, 33, 36

*Hunter v. Underwood,*
471 U.S. 222 (1985) ................................................................. 37, 41

*In re Advisory Opinion re Constitutionality of
PA 1970, No. 100*, 180 N.W.2d 265 (Mich. 1970) ........................... 1, 13

*Kennedy v. Bremerton School District*,
142 S. Ct. 2407 (2022) ......................................................................... 35

*Lipman v. Budish*,
974 F.3d 726 (6th Cir. 2020) .............................................................. 26

*Miller v. Johnson*,
515 U.S. 900 (1995) ............................................................................. 37

*Mitchell v. Helms*,
530 U.S. 793 (2000) ............................................................................... 6

*Personnel Administrator of Massachusetts v. Feeney*,
442 U.S. 256 (1979) ....................................................................... 37, 41

*Schuette v. Coalition to Defend Affirmative Action*,
572 U.S. 291 (2014) ....................................................... 26, 27, 30, 31

*Traverse City School District v. Attorney General*,
185 N.W.2d 9 (Mich. 1971) ......................................................... 2, 38, 39

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
137 S. Ct. 2012 (2017) .......................................................................... 2

*Village of Arlington Heights v. Metropolitan Housing
Development Corp.*,
429 U.S. 252 (1977) ....................................................................... 37, 38

*Washington v. Seattle School District No. 1*,
458 U.S. 457 (1982) ................................................................... *passim*

*Zelman v. Simmons-Harris*,
536 U.S. 639 (2002) ........................................................................... 6, 7

**Statutes**

28 U.S.C. § 1291 ................................................................................. viii

Page(s)

28 U.S.C. § 1331 ...................................................................viii

Mich. Comp. Laws § 380.502...........................................22, 42

**Other Authorities**

*2022 Michigan Election Results*, Mich. Sec'y of State,
    https://mielections.us/
    election/results/2022GEN_CENR.html (last updated
    December 22, 2022)................................................................21

Federal Rule of Civil Procedure 12 ....................................24, 26

Joseph P. Viteritti, *Blaine's Wake: School Choice, the First
    Amendment, and State Constitutional Law*, 21 Harv. J. L.
    & Pub. Pol'y 657 (1998)..........................................................5, 6

Matthew J. Brouillette, Mackinac Center for Public Policy,
    *School Choice in Michigan: A Primer for Freedom in
    Education* (1999) .....................................................................20

*Merriam-Webster's Unabridged Dictionary* ...........................14

Michael W. McConnell et al., *Religion and the Constitution*
    (2002).........................................................................................5

Michigan Constitution, Article VIII........................1, 2, 14, 20

Michigan Constitution Article XII ...........................................21

Toby Heytens, Note, *School Choice and State Constitutions*,
    86 Va. L. Rev. 117 (2000)...............................................4, 5, 6, 7

## STATEMENT REQUESTING ORAL ARGUMENT

This appeal presents substantial questions regarding application of the Fourteenth Amendment political-process doctrine to facially neutral constitutional amendments that were intended to and do have a disproportionate impact on religious people. Given the importance of the constitutional right at stake, and the number of Michigan citizens impacted, Appellants respectfully submit that this Court's decision-making process would be aided by oral argument.

## JURISDICTION

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. This is an appeal from the district court's final judgment entered on September 30, 2022. R.40, J., PageID.285. Appellants timely filed their notice of appeal on October 28, 2022. R.41, Notice of Appeal, PageID.286. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUE FOR REVIEW

Following modest legislative victories in favor of parochial-school parents, explicitly antireligious groups mobilized voter animus against religion to mount a ballot campaign that resulted in a constitutional amendment that facially bars any direct or indirect public financial support for nonpublic schools. The amendment not only undid the modest legislative victories parochial-school parents obtained but also imposes a likely insurmountable burden on future attempts to obtain similar relief from the Michigan Legislature. Given the Michigan Supreme Court's holding that the amendment was motivated by antireligious animus, and the extensive evidence supporting that conclusion, does the amendment violate the Equal Protection Clause?

## INTRODUCTION

In the mid-1960s, after years of paying private, religious-school tuition *and* paying taxes that subsidized public schools, families who sent their children to private religious schools began to lobby the State of Michigan to provide a modicum of financial support. In response, the Legislature proposed allocating a modest $100 for each high-school student and $50 to each grade-school student attending a private school. This legislation ultimately became law with the passage of 1970 PA 100, and the Michigan Supreme Court upheld it, concluding that the bill neither advanced nor inhibited religion and did not violate the free exercise or establishment clauses of the U.S. or Michigan constitutions. *In re Advisory Opinion re Constitutionality of PA 1970, No. 100*, 180 N.W.2d 265 (Mich. 1970).

Political forces mobilized voter animus against religion to mount a ballot campaign that resulted in Article VIII, § 2, ¶ 2 of Michigan's Constitution—a so-called "Blaine Amendment"—that bars any direct or indirect public financial support for nonpublic schools, whether by appropriation, tax exemption, or otherwise. R.1, Compl. ¶ 33, PageID.9–

10. The U.S. Supreme Court has condemned similar Blaine Amendments that deprive religious schools and families of an equal opportunity to public benefits. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246 (2020); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012 (2017). But Michigan has defended the continued vitality of its Blaine Amendment on the ground that Article VIII, § 2, ¶ 2 is facially neutral, i.e., it prohibits public financial support for *any* nonpublic school and does not explicitly target only religious schools.

But as the Michigan Supreme Court has held, "with ninety-eight percent of the private school students being in church-related schools" in 1970, Article VIII, § 2, ¶ 2's classification "is nearly total" in its "impact" on the class of "church-related schools." *Traverse City Sch. Dist. v. Attorney Gen.*, 185 N.W.2d 9, 29 (Mich. 1971). Indeed, "As far as the voters were concerned in 1970 . . . '—[the Blaine Amendment] was an anti-parochiaid amendment—no public monies to run parochial schools—and beyond that all else was utter and complete confusion.'" *Council of Orgs. & Others for Educ. About Parochiaid, Inc. v. Engler*, 566 N.W.2d 208, 220–21 (Mich. 1997) (quoting *Traverse City*, 185

N.W.2d at 17 n.2)). In other words, the Blaine Amendment's anti-religious impact was intentional, and it continues today.

Under Michigan's Blaine Amendment, religious persons and schools cannot lobby their state representative or state senator for governmental aid or tuition help. Rather, they must undertake the onerous process of securing signatures and passing a state constitutional amendment.   By eliminating the right of religious persons and institutions to petition for legislative help on the same terms as other people, the Michigan Blaine Amendment structurally denies religious persons and institutions the "rights, privileges and immunities" secured by the Equal Protection Clause and by the Constitution and laws of the United States. Appellants are entitled to a ruling that places them on a level political-access field with public-school parents.

This Court should reverse the district court's dismissal of Appellants' equal-protection claim and, because the disputed issues are purely legal, remand with instructions to enter judgment in favor of Appellants on that claim.

# STATEMENT OF THE CASE

## Factual background

### A. Appellants seek public assistance for private, religious-school tuition.

Appellants Jill and Joseph Hile, Jessie and Ryan Bagos, Samantha and Phillip Jacokes, Nicole and Jason Leitch, and Michelle and George Lupanoff are parents of school-age children who would like to obtain public assistance for their children's private, religious-school tuition in Michigan. R.1, Compl. ¶¶ 17–21, PageID.6–7. Each is a member of Appellant Parent Advocates for Choice in Education Foundation, also known as P.A.C.E. *Id.* P.A.C.E. is a grassroots coalition of parent advocates who seek to protect and advance their rights regarding their children's education. *Id.* ¶ 22, PageID.7.

### B. The antireligious origin of Blaine Amendments.

State constitutional amendments prohibiting the use of public funds to support or maintain private religious schools are called "Blaine Amendments" after Congressman and later Senator James G. Blaine of Maine. R.1, Compl. ¶ 36, PageID.10–11; *see also* Toby Heytens, Note, *School Choice and State Constitutions*, 86 Va. L. Rev. 117, 131 (2000). In 1875, Blaine proposed an amendment to the U.S. Constitution that

sought to bar government aid to sectarian schools and institutions. R.1, Compl. ¶ 36, PageID.10–11.

When Blaine made his proposal, public schools—often described as common schools—were largely Protestant. *Id.* ¶ 37, PageID.11. As one scholar explains, the "common-school curriculum promoted a religious orthodoxy of its own that was centered on the teachings of mainstream Protestantism." *Id.*; *see also* Joseph P. Viteritti, *Blaine's Wake: School Choice, the First Amendment, and State Constitutional Law*, 21 Harv. J. L. & Pub. Pol'y 657, 666 (1998). The public preference for nonsectarian schools was widely understood to be a preference for Protestant schools, as the two concepts were one and the same. R.1, Compl. ¶ 39, PageID.11; *see also* Michael W. McConnell et al., *Religion and the Constitution* 451–56 (2002).

Catholic immigrants, who began to arrive in America in waves in the 1800s, "perceived Protestant-controlled public schools as hostile to their faith and values." R.1, Compl. ¶ 38, PageID.11; *see also* Heytens, *supra*, at 136. And these immigrants began to request governmental financial support for Catholic schools. R.1, Compl. ¶ 38, PageID.11. As Justice Breyer has explained, "Catholics sought equal government

support for the education of their children in the form of aid for private Catholic schools. But the 'Protestant position' on this matter . . . was that public schools must be 'nonsectarian' (which was usually understood to allow Bible reading and other Protestant observances) and public money must not support 'sectarian' schools (which in practical terms meant Catholic)." *Zelman v. Simmons-Harris*, 536 U.S. 639, 721 (2002) (Breyer, J., dissenting).

It is now beyond dispute that the Blaine Amendment was largely an anti-Catholic response to the request for public funding for Catholic schools. R.1, Compl. ¶¶ 44, PageID.12; *see also* Heytens, *supra*, at 138; Viteritti, *supra*, at 659 ("[T]he Blaine Amendment is a remnant of nineteenth-century religious bigotry promulgated by nativist political leaders who were alarmed by the growth of immigrant populations and who had particular disdain for Catholics."). "Consideration of the [Blaine] amendment arose at a time of pervasive hostility to the Catholic Church and to Catholics in general, and it was an open secret that 'sectarian' was a code for 'Catholic.'" *Mitchell v. Helms*, 530 U.S. 793, 828 (2000) (plurality opinion).

Blaine's Amendment was supported by President Grant and approved by the House of Representatives. R.1, Compl. ¶ 43, PageID.12. But it narrowly failed to achieve the two-thirds majority in the Senate necessary for a constitutional amendment. *Id.* In the wake of that defeat, "approximately thirty states wrote or amended their constitutions to include language substantially similar to that of" the federal Blaine Amendment. Heytens, *supra*, at 133. Indeed, Congress made the inclusion of Blaine Amendments a condition of admission to the Union for several states. *Id.*

These state Blaine Amendments were significantly motivated by anti-Catholic religious animus "to make certain that government would not help pay for 'sectarian' (i.e., Catholic) schooling for children." *Zelman*, 536 U.S. at 721 (Breyer, J., dissenting).

### C. The antireligious lead up to Michigan's Blaine Amendment.

Michigan was no stranger to this nativist, anti-Catholic, and anti-parochial school zeitgeist. R.1, Compl. ¶ 48, PageID.13. In 1847, Michigan's State Superintendent of Public Instruction gave a speech, later endorsed by the Michigan Legislature, that Michigan's common

schools should inculcate the doctrines of the Sermon on the Mount and the sublime precepts of the Bible. *Id.* ¶ 49, PageID.13. He relied on his listeners' presumed common descent from the Puritans to unite them in the goal "as Protestants" to encourage the reading of scripture in the common schools. *Id.* The speech caused outrage among Catholics and prompted a call to allow parents to decide where public funds would be spent to educate their children—a precursor to later calls for school vouchers. *Id.* ¶ 50, PageID.13.

By 1900, at least 1 in 20 students in Michigan attended Catholic parochial schools. *Id.* ¶ 51, PageID.13. The growth of the parochial schools led to the formation in 1916 of the Wayne County Civic Association, whose primary purpose was to defend the public schools and the complete opposition to parochial schools in Michigan. *Id.* ¶ 52, PageID.13. The Civic Association was successful in placing an initiative on the November 1920 ballot that would have amended the Michigan Constitution to require all Michigan residents between 5 and 16 to attend public school. *Id.* ¶ 53, PageID.14. The proposed amendment failed. *Id.* ¶ 54, PageID.14.

The Ku Klux Klan and the Public School Defense League succes-sfully petitioned to place a substantively similar initiative on the 1924 ballot. *Id.* It too failed at the ballot box. *Id.* Nonetheless, the message was clear: there was a substantial portion of the Michigan electorate that believed sectarian schools should be outlawed. *Id.* ¶ 55, PageID.14.

Parents whose children attended religious schools continued efforts to obtain educational parity. *Id.* ¶ 56, PageID.14. In the late 1950s, State Representative T. John Lesinksi of Detroit authored a bill that would have allowed parochial schools to receive funds from the Michigan State School Fund. *Id.* ¶ 57, PageID.14. That bill was defeated in 1959. *Id.*

In 1960, a chapter of Citizens for Educational Freedom ("CEF") was launched at St. Matthew's Lutheran Church in Detroit. *Id.* ¶ 58, PageID.14. CEF advocated for parents' rights to send their children to the schools of their choice. *Id.* ¶ 59, PageID.14. Michigan's CEF chapters were ecumenical, including Catholic, Christian Reformed, and Lutheran members. *Id.* ¶ 60, PageID.14.

CEF's efforts played a role in the Michigan Constitutional Convention of 1961 to 1962. *Id.* ¶ 62, PageID.15. Attempts were made to alter Article II of the Michigan Constitution, which prohibited money from being appropriated from the state treasury for "the benefit of any religious sect or society." *Id.* Those attempts were unsuccessful. *Id.*

CEF's efforts then shifted to passage of a bus bill requiring all public school districts to extend bus service to nonpublic school pupils within the districts. *Id.* ¶ 63, PageID.15. The American Civil Liberties Union and the Protestants and Other Americans United for the Separation of Church and State were bitterly opposed to the bus bill. *Id.* ¶ 64, PageID.15. This time the anti-religious groups were unsuccessful, and in 1963, Governor George Romney signed the bus bill into law. *Id.* ¶ 65, PageID.15.

The Michigan ACLU sued, challenging the constitutionality of the bus bill. *Id.* ¶ 66, PageID.15. The ACLU lawsuit ended after the Michigan Court of Appeals upheld the bus bill. *See generally Alexander v. Bartlett*, 165 N.W.2d 445 (Mich. Ct. App. 1968).

In 1965, an Auxiliary Services Bill was introduced in the Michigan Legislature. *Id.* ¶ 67, PageID.15. This bill required local school boards

to provide such things as crossing guards, speech services, and remedial reading services to religious and other nonpublic schools within each school district. *Id.*

Opposition to the bill was vehement and cast in religious terms. *Id.* ¶ 68, PageID.15. Midland's Public School Superintendent likened the bill to promotion of religious segregation. *Id.* ¶ 69, PageID.16. Another superintendent argued that the state "should avoid financial support for any instructional classes set up primarily on a segregated basis . . . by religion." *Id.* ¶ 70, PageID.16. Despite these antireligious sentiments, the Auxiliary Services Bill also passed and was signed by Governor Romney in July 1965. *Id.* ¶ 71, PageID.16.

The CEF continued to lobby for further indirect aid to "church related schools." *Id.* ¶ 73, PageID.16. This lobbying led to the creation of an organization to oppose CEF's efforts, Michigan Citizens for the Advancement of Public Education or CAPE. *Id.* ¶ 74, PageID.16. CAPE's antireligious aims were clear. *Id.* ¶ 75, PageID.16. One member lamented "three recent state laws" that had "diverted money to Church schools" and charged religious schools with "creating ghettos of the mind." *Id.*

In early 1968, the Investment in the Education of Children Act was introduced in the Michigan Legislature. *Id.* ¶ 78, PageID.17. It would provide grants of up to $150 to parents of non-public students. *Id.* The media labeled the act "Parochiaid" because the overwhelming majority of students in private schools were attending religious schools. *Id.* ¶ 79, PageID.17. The House and the Senate then authorized joint legislative hearings to examine the prudence, feasibility, and constitutionality of the act. *Id.* ¶ 80, PageID.17. The joint report resulting from those hearings recommended the state appropriate $40 million to purchasing the teaching services of lay teachers of secular subjects in non-public schools. *Id.* ¶ 81, PageID.17.

Eventually, the Legislature took up this recommendation and passed legislation, 1970 PA 100, which allowed the Department of Education to purchase educational services from nonpublic schools in secular subjects. *Id.* ¶ 82, PageID.17. The Michigan Supreme Court affirmed the appropriation's validity, concluding that the legislation neither advanced nor inhibited religion and did not violate the free exercise or establishment clauses of the U.S. or Michigan constitutions.

*In re Advisory Opinion re Constitutionality of PA 1970, No. 100*, 180 N.W.2d 265 (Mich. 1970).

In 1970, most nonpublic school students were in religious schools. *Id.* ¶ 83, PageID.17. Catholic schools alone accounted for nearly 218,000 of the 275,000 nonpublic school students in the state. *Id.* ¶ 84, PageID.18 (citing *Detroit News*, Nov. 1, 1970). The National Union of Christian Schools of the Christian Reformed Church enrolled another 23,000 students. *Id.* ¶ 85, PageID.18 (citing *Detroit News*, Nov. 1, 1970). As a result, "nonpublic schools" in Michigan circa 1970 meant "religious schools." *Id.* ¶ 86, PageID.18.

Opponents of the 1970 funding measure turned public opinion against state funding by demonizing religious schools generally and the Catholic Church and the Catholic school system in particular. *Id.* ¶ 87, PageID.18.

## D. Michigan adopts a Blaine Amendment through Proposal C.

The opponents to nonpublic school funding created a ballot committee, the "Council Against Parochiaid." *Id.* ¶ 88, PageID.18. "Parochiaid" plays on the word "parochial," which means "of or relating

to a church parish." Parochial, *Merriam-Webster's Unabridged Dictionary*, https://unabridged.merriam-webster.com/unabridged/parochial. The religiously loaded term thus reveals that the initiative's motivation and purpose mirrored that of the various state Blaine Amendments of the 1800s. R.1, Compl. ¶ 89, PageID.18.

The Council Against Parochiaid introduced to the November 1970 ballot what was known as "Proposal C," which eventually became Article VIII, § 2, ¶ 2 of the Michigan Constitution—Michigan's Blaine Amendment. *Id.* ¶ 90, PageID.18. The proposal was seemingly neutral in its language, barring public funding not only for "denominational" schools but for all "nonpublic" schools. *Id.* ¶ 91, PageID.19. But the public advocacy and invective removed any doubt that Proposal C was an antireligious measure aimed at harming religious groups, especially the Roman Catholic Church:

- In a May 21, 1969 address that Dr. Maurice Geary gave to the CAPE Board of Directors, he railed that "[t]he Catholic Church is the biggest corporation in the United States. Real estate holdings are more than Standard Oil, A.T.&T. and U.S. Steel combined. . . . There is no more-closely guarded secret than the assets and income of the church." Dr. Geary opined that parochiaid is "anti-American" and inappropriate.

- The March and April 1970 issues of *The Vanguard*, the official publication of the Trade Union Leadership Council that was part

of the pro-Proposal C coalition was filled from cover to cover with invectives, including statements accusing Governor Milliken of vying for the Catholic vote and maligning State Representative Ryan for trying to get the public coffers opened to the church.

- On May 25, 1970, an article in the *Grand Rapids Press* presented poll numbers showing that Proposal C would be soundly defeated. But that was *before* the anti-religious propaganda began in earnest.

- A June 28, 1970 article in the *Flint Journal*, quoting a Michigan legislator, framed the forthcoming religious dispute this way: "Republicans who tend to have conservative images can be for abortion reform but against parochiaid—largely because of their Protestant background. Democrats, despite their liberal tags, can support parochiad but oppose abortion reform—largely because of the Catholic influence."

- A pro-Proposal C ad published in the *Lansing State Journal* on October 29, 1970, and again on November 1, 1970, encouraged voters to "SUPPORT CHURCHES BY GIVING ON SUNDAY! (AND NOT WITH OUR PUBLIC TAX MONEY)." The ad urged a yes vote because "THE PUBLIC DID NOT ESTABLISH THE CHURCH SCHOOLS" and "THE PUBLIC DOES NOT HAVE A VOICE IN CHURCH SCHOOL AFFAIRS," and religious schools promoted "SEGREGATION ON A RELIGIOUS BASIS!" The same ad appeared in the *Flint Journal* on November 1, 1970, the *Grand Rapids Press* on October 29, 1970, and the *Detroit Free Press* on October 3, 1970, and November 2, 1970.

- Another *Lansing State Journal* pro-Proposal C ad published on October 31, 1970 noted the current $22 million appropriation "for private and Parochial schools" and warned in exaggerated fashion that "When the Parochiaid people reach their goal of funding private and church schools on an equal basis with public schools, it will cost Michigan Taxpayers at least a QUARTER OF A BILLION DOLLARS!!"

- Yet another pro-Proposal C ad published in the *Lansing State Journal* on November 2, 1970, urged voters to say yes to Proposal C to "prevent the clergy of various sects from quarreling over how to divide the public's money among them" and said a yes vote would "prevent government preference and favoritism toward one or a few churches"—presumably the Catholic and Christian Reformed churches that made up the overwhelming percentage of private religious schools.

- A pro-Proposal C op-ed published October 26, 1970, in the *Lansing State Journal* by the President of the Grand Rapids Chapter of Americans United for Separation of Church and State warned that "[a]s more tax funds are pumped into school systems not controlled by the public, enrollments are encouraged and other churches and private groups are encouraged to open similar schools in which to indoctrinate children in their religious or political beliefs." *Voters should "reject all demands of politically-active clergy men* who are seeking tax funds for religious schools. It was their decision, not the public's to open and to operate them." [Emphasis added.]

- A *Flint Journal* article on October 12, 1970, reported on a public speech by a prominent pro-Proposal C Methodist minister who "put it bluntly": "the politicians want Catholic votes and the Catholic church wants money. It is that simple." The speaker blamed the Catholic Schools' need for public funding on the fact that "the schools are no longer popular."

- Council Against Parochiaid campaign literature helped voters understand that Proposal C was *not* about private secular schools: "LET'S BE FAIR. . . . . . .More than 90% of all parochiaid funds go to schools owned by the clergy of one politically active church – a church which pays no taxes on its $80 billion holding in real estate, stocks, bonds, and business investments, or on its $12 billion annual income in this country."

- A missive by Spend Taxes on Public Schools (STOP), a "committee of individuals and organizations formed to protect the public schools against such diversion of public tax funds," presented the

City of Holland "as an example of the effect of spending public funds on private schools" based on Ottawa County's amendment to allow public support for private schools. As STOP explained, "Before that time, 80% of the children attended public schools; today only 20% do. There are strong Roman Catholic and Protestant schools, and the public schools are weak." "[P]arochial education's only purpose," STOP opined, "is complete indoctrination of the child in the religious beliefs of a single denomination or faith," including "teachers" "in the costume of a religious order."

- An October 14, 1970 *Saginaw News* article reported on a speech by the regional director for Americans United for Separation of Church and State who accused "religious leaders" "and "unprincipled politicians" of "join[ing] hands" "in open disrespect for law and truth" when it came to Proposal C. The director claimed that opposition to "parochiaid is not opposition to the Catholic religion." "But since the Catholic Church has entered the political arena, it must be confronted as a political entity."

- An October 25, 1970 *Detroit Free Press* editorial recognized the anti-religious fervor, even while supporting a yes vote on Proposal C: "When a state—especially a pluralist, diverse state—undertakes as a matter of public policy to support a church-related school system, it invites religious bitterness and stirs up religious discord."

- An October 31, 1970 *Detroit Free Press* editorial asked, "Who would have thought at this late date in our history that we could face a political battle with such overtones of religious bitterness? The basis for religious friction is not dead, not here nor in most other parts of the world. And when it is made a matter of public debate, religion is thrust into politics in a way that is risky to it and to the state." The editorial ultimately urged a yes vote on Proposal C, not because of any concerns over non-public-school funding generally but because "[t]he state simply has no business proving public funds for the support of *religious* institutions." [Emphasis added.]

- An October 10, 1970 *Detroit News* article reported on the leader of Michigan's (then) 370,000 United Methodists, who wrote in support of Proposal C in his denomination's publication, *Michigan Christian Advocate*, that the "phobia" motivating Proposal C supporters "is that the tax money is being used for *religious* education." [Emphasis added.]

- A *Grand Rapids Press* article on November 1, 1970, described the political debate over Proposal C in starkly religious terms, noting that "both supporters and opponents have been waging an intense campaign to sway voters in a state where Protestants outnumber Roman Catholics about two-to-one."

- A *Grand Rapids Press* op-ed published October 24, 1970, made similar points while discussing Proposal C's impact on the Michigan Governor's race, noting "[t]he complexity of the [Proposal C] issue, and the emotionalism and religiosity surrounding it." "Catholics . . . have been working hard against so-called Proposal C," it explains.

- The *Grand Rapids Press* published an article on October 22, 1970, summarizing the views of a member of the State Board of Education, explaining that "The ability of parochial schools to politick would be in serious question if Proposal C (the antiparochiaid constitutional amendment on the ballot) should pass."

- The Council Against Parochiaid in late October 1970 urged its county coordinators to organize letters to the editors—three to four each day—in the three weeks leading up to the election. *Proposal C Yes Bulletin* (Oct. 30, 1970). This resulted in a flood of anti-Catholic letters urging fellow citizens to vote yes on Proposal C, only a few of which are sampled here:

  o Some letters used religious schools to play the race card: "If public money pays for religious schools, there seems to be no reason why it would not also pay for racial school – all-black schools and all-white schools to teach hatred and intolerance." *Grand Rapids Press*, October 24, 1970.

o Others warned about religious-school indoctrination of young minds: "The purpose of any religious school is to segregate children so as to indoctrinate them in a particular religion." *Grand Rapids Press*, October 19, 1970.

o Still others urged a yes on Proposal C to "prevent the clergy of various sects from quarreling over how to divide the public's money among them." *Grand Rapids Press*, October 18, 1970.

o A joint letter from the Michigan Education Association, American Civil Liberties Union, Committee Against Parochiaid, the League of Women Voters, the United Methodist Church, and Educators for Better Government—some of Proposal C's biggest supporters—played the discrimination card. A vote for Proposal C, they said "will preserve our public schools, which serve all children and hire teachers of all faiths without discrimination or bias. Private schools discriminate in admission policies and in hiring policies." *Flint Journal*, October 31, 1970.

o Others clearly understood that Proposal C was primarily a choice against or for religious schools, despite the Proposal's clearly neutral language: "The antiparochiaid forces argue, and I am inclined to agree, that they should not be forced to support schools that are grounded in religious faith." *Flint Journal*, October 19, 1970.

o A letter supporting Proposal C argued that tolerance and a cohesive society are best achieved when students are not allowed to isolate themselves in religious schools. *Lansing State Journal*, October 30, 1970.

o The Detroit Free Press noted that the debate regarding Proposal C was "a political battle with [ ] overtones of religious bitterness." *Detroit Free Press*, October 31, 1970.

*Id.* ¶¶ 91–92, PageID.19–23.

All the religious invective proved successful. *Id.* ¶ 93, PageID.23. Flipping the early polling, voters approved Proposal C with 56 percent of the votes cast in November 1970. Matthew J. Brouillette, Mackinac Center for Public Policy, *School Choice in Michigan: A Primer for Freedom in Education* 14–15 (1999). Reading the public advocacy contemporaneously and again two decades later, the Michigan Supreme Court twice held, definitively, that "[a]s far as the voters were concerned in 1970 . . . '—[the Blaine Amendment] was an anti-parochiaid amendment—no public monies to run parochial schools.'" *Council of Orgs. & Others for Educ. About Parochiaid, Inc. v. Engler*, 566 N.W.2d 208, 220–21 (Mich. 1997) (quoting *Traverse City Sch. Dist. v. Attorney Gen.*, 185 N.W.2d 9, 17 n.2 (Mich. 1971)).

### E. Michigan's Blaine Amendment restructured the political process against religious persons.

Proposal C's prohibition on public funding for parochial and private schools became part of Michigan's Constitution. Mich. Const. art. VIII, § 2, ¶ 2. The constitutionalizing of the prohibition meant and still means that parents seeking to send their children to parochial schools cannot simply lobby their state representative or state senator

for governmental aid or tuition help as parents of children attending public schools might do. After all, the Michigan Legislature cannot pass a law that violates Michigan's Constitution. Rather, parochial-school parents first must pursue and pass a constitutional amendment reversing the Blaine Amendment.

That is no easy process. Under Michigan's Constitution, amend-ments may be proposed in two ways: (1) by two-thirds vote of both houses of the Michigan Legislature, or (2) by petition of the number of registered voters equal to or greater than 10 percent of the votes for governor[1] in the last general gubernatorial election. Mich. Const. art. XII, §§ 1–2. Successfully proposed amendments must then be approved by a majority of voters. *Id.*

Setting aside these procedural hurdles, the amendment process is expensive. For instance, campaign finance reports submitted shortly before this past November's election showed that proponents and opponents of Proposition 3—which amended Michigan's Constitution to

---

[1] For reference, according to the Michigan Secretary of State, 4,461,972 total votes were cast for governor in the 2022 general election. *2022 Michigan Election Results*, Mich. Sec'y of State, https://mielections.us/election/results/2022GEN_CENR.html (last updated December 22, 2022). So, a proponent today would need more than 446,000 signatures.

create a right to abortion—had raised $57 *million* dollars, more than "campaigns for governor, secretary of state and attorney general combined." Yue Stella Yue, *Proposal 3 abortion measure generates $57M in Michigan campaign donations*, Bridge Michigan (Oct. 28, 2022), available at https://bit.ly/3R18qGl. This places religious citizens who desire to lobby for funding for their children's religious schools at a distinctive political disadvantage vis-à-vis parents of public-school students.

### F. Michigan gives secular private schools an option to receive public funds.

Notwithstanding the Blaine Amendment's facial prohibition of aid to all nonpublic schools, Michigan provides secular private schools an option to receive public funds. Specifically, private, secular schools that desire public funding can seek charter-school status. *See generally* Mich. Comp. Laws § 380.502. Private religious schools cannot. R.1, Compl. ¶ 138, PageID.31.

Notably, Michigan's charter-school law was challenged based on the Blaine Amendment. *Parochiaid,* 566 N.W.2d at 211. The Michigan Supreme Court explicitly relied on the Blaine Amendment's

antireligious purpose to reject that challenge. *Id.* at 220–21. The Court explained that the Blaine Amendment did not bar the law because "the common understanding of the voters in 1970 was that no monies would be spent to run a parochial school" and "public school academies are not parochial schools." *Id.* at 221.

**Proceedings below**

> ### A. Appellants file their complaint, and the State moves to dismiss it.

On September 23, 2021, Appellants filed their complaint against the State of Michigan; Governor Gretchen Whitmer, in her official capacity; and Treasurer Racheal Eubanks, in her official capacity (collectively, the "State"). *See generally* R.1, Compl., PageID.1–34. As is relevant here,[2] Appellants alleged in Count IV that Michigan's Blaine Amendment violates the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution because it eliminated the right of religious persons and institutions to petition for legislative help on the

---

[2] Appellants also brought claims related to the Blaine Amendment's effect on uses of tax-advantaged funds under the Michigan Education Savings Program Act. R.1, Compl. ¶¶ 107–44, PageID.26–31. Appellants do not challenge the dismissal of those claims on appeal.

same terms as other citizens. R.1, Compl. ¶¶ 146–56, PageID.31–33. They sought a declaration that the Blaine Amendment is unconstitutional and an order permanently enjoining the State from enforcing it. R.1, Compl. p. 34, PageID.34.

The State moved to dismiss Appellants' equal protection claim under Federal Rule of Civil Procedure 12(b)(6). R.13, State Br. 32–34, PageID.104–06. It contended that the Blaine Amendment does not violate the Fourteenth Amendment because it is facially neutral. *Id.* at 32, PageID.104.

## B. The district court grants the State's motion to dismiss.

The district court granted the State's motion to dismiss. R.39, Op. 9, PageID.284. In relevant part, the district court doubted that the Supreme Court's Fourteenth Amendment political-process doctrine, on which Appellants' equal protection claim is based, still has any viability. *Id.* at 8, PageID.283. Even if it did, the district court reasoned, it applies "only in situations where the text of the legislation or ordinance at issue expressly single[s] out race as the trigger for additional procedural burdens." *Id.* Because Appellants' claim deals

with religion, not race, and a facially neutral enactment, the district court held that it failed as a matter of law. *Id.* at 8–9, PageID.283–84.

This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court erred when it held that Michigan's Blaine Amendment does not create a discriminatory political structure because it deals with religion, not race, and is facially neutral. The Supreme Court's political-process doctrine—which recognizes that restructuring the political process to impose special burdens on a suspect class is an equal protection violation no different from denying a person the right to vote—remains valid, and neither logic nor case law supports the conclusion that it applies only to racial discrimination.

The Blaine Amendment's facial neutrality does not end the equal protection inquiry; otherwise, it would be a get-out-of-jail-free card for enactments that are intended to, and do, have a disproportionate impact on protected classes. Here, the Michigan Supreme Court has already determined that the Blaine Amendment was aimed at religious people and almost exclusively impacts parochial schools. This Court should defer to the state court's assessment of its own state's law,

particularly given the extensive historical, public evidence supporting it.

This Court should reverse and remand with instructions to enter judgment in favor of Appellants on that claim.

## STANDARD OF REVIEW

This Court "review[s] a district court's grant of a motion to dismiss de novo." *Lipman v. Budish*, 974 F.3d 726, 740 (6th Cir. 2020) (citation omitted). To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court "must accept the factual allegations in the complaint as true and construe the complaint in the light most favorable to the plaintiff." *Lipman*, 974 F.3d at 740 (citation omitted).

## ARGUMENT

### I. The *Schuette* decision did not overrule the Supreme Court's political-process doctrine precedent.

Relying on *Schuette v. Coalition to Defend Affirmative Action*, 572 U.S. 291 (2014), the district court opined that the Supreme Court's political-process doctrine may not "still exist[] at all." R.39, Op. 8,

PageID.283. The district court was wrong. *Schuette* did not repudiate the political-process doctrine as a whole. Quite the opposite, six of eight justices declined the explicit invitation to overrule the cases adopting it. 572 U.S. at 320 (Scalia, J., concurring in the judgment) (criticizing the Court for *refusing* to overrule the cases).

The political-process doctrine was developed primarily in two Supreme Court decisions: *Hunter v. Erickson*, 393 U.S. 385 (1969), and *Washington v. Seattle School District No. 1*, 458 U.S. 457 (1982). In *Hunter*, the Akron City Council passed a real-estate antidiscrimination ordinance. Voters responded by amending the city's charter to require that ordinances regulating real-estate transactions on the basis of race, religion, or ancestry (but not on other bases) be approved by a majority of voters. 393 U.S. at 386–87. The Court noted the structural disadvantage the charter amendment created for minorities:

> Only laws to end housing discrimination must run [the] gauntlet [of a referendum]. It is true that the section draws no distinctions among racial and religious groups. Negroes and whites, Jews and Catholics are all subject to the same requirements if there is housing discrimination against them which they wish to end. But [the charter amendment] disadvantages those who would benefit from laws barring racial, religious, or ancestral discriminations as against those who

> would bar other discriminations or who would
> otherwise regulate the real estate in their favor.
> [*Id.* at 390–91.]

This structural disadvantage, the Court held, ran afoul of the Equal Protection Clause: a state "may no more disadvantage any particular group by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size." *Id.* at 393.

The Court reaffirmed this anti-political restructuring principle in *Seattle*. There, a Seattle school district adopted a busing plan to desegregate the city's schools. 458 U.S. at 461. Seattle residents opposed to the plan formed an advocacy group, which successfully proposed a statewide ballot initiative that barred school boards from "directly or indirectly requir[ing] any student to attend a school other than the school which is geographically nearest or next nearest" to the student's home and offers the student's course of study. *Id.* at 461–62. Despite the initiative's facial neutrality, advocacy during the campaign made clear that its target was busing for purposes of desegregation. *Id.* at 463; *see also id.* at 471.

As in *Hunter*, the Court rejected this attempt to force minorities to jump through extra hoops to obtain legislative help. It is unconstitutional, the Court held, "for a community to require that laws or ordinances designed to ameliorate race relations or to protect racial minorities, be confirmed by popular vote of the electorate as a whole, while comparable legislation is exempted from a similar procedure." *Id.* at 487. States cannot allocate power so as to place "unusual burdens" on suspect classes to "enact legislation specifically designed to overcome the 'special condition' of prejudice." *Id.* at 486 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 153 n.4 (1938)).

More than 30 years later, the Supreme Court granted certiorari in *Schuette* to consider whether a Michigan constitutional amendment barring racial *preferences* violated the Equal Protection Clause under the political-process doctrine. But *Schuette* did *not* overrule *Hunter* or *Seattle*. To be sure, *Schuette* reversed a decision that employed the political-process doctrine to strike down the Michigan amendment. But the Supreme Court did so because the amendment required equal treatment and thus did *not* involve the sort of harm or animus that was present in its prior political-process doctrine cases. Indeed, the Court

explained that the lower court's decision extended "*Seattle*'s holding in a case presenting quite different issues to reach a conclusion that is mistaken here." 572 U.S. at 302.

The Supreme Court elaborated that "*Seattle* is best understood as a case in which the state action in question . . . had the *serious risk, if not purpose*, of causing *specific injuries on account of*" a constitutionally protected characteristic. *Id.* at 305 (emphasis added). By contrast, *Schuette* did not stem from such a purpose or pose such a risk. As the Supreme Court noted, in the specific context presented by *Schuette* "there was no infliction of a specific injury of the kind at issue in . . . *Hunter* and in the history of the Seattle schools." *Id.* at 310. And, therefore, the lower court's decision striking down a political restruc-turing in the context of racial *preferences* meant that "[r]acial division would be validated, not discouraged." *Id.* at 309.

Importantly, *Schuette* did not hold that the political-process doctrine never applies. "[W]hen hurt or injury is inflicted on" a suspect class "by the encouragement or command of laws or other state action, the Constitution requires redress by the courts." *Id.* at 313. "*Hunter*[ ]

and *Seattle* are . . . cases . . . in which the political restriction in question was designed to be used, or was likely to be used, to encourage infliction of injury by reason of race," that is, inflicted because of a group's suspect class. *Id.* at 313–14.

The Court's refusal to overrule *Hunter* and *Seattle* means those precedents are still good law. And when the Supreme Court has declined to overrule precedent, lower federal courts are bound by that precedent. *Grutter v. Bollinger*, 288 F.3d 732, 743–44 (6th Cir. 2002) (en banc) ("If a precedent of the Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to the Supreme Court the prerogative of overruling its own decisions." (quoting *Agostini v. Felton*, 521 U.S. 203, 237 (1997)) (cleaned up)), *aff'd*, 539 U.S. 306 (2003). In other words, it is for the Supreme Court to tell lower courts when a decision has been overruled, not for lower courts to tell the Supreme Court when it has done so implicitly. *Hohn v. United States*, 524 U.S. 236, 252–53 (1998) ("Our decisions remain binding precedent until we sit fit to reconsider them, regardless

of whether subsequent cases have raised doubts about their continuing vitality.").

As discussed in greater detail below, this is the same type of case as *Hunter* and *Seattle*. The only distinction is that, here, the political restriction was designed to inflict injury by reason of religion, not race. But *Hunter* and *Seattle* make clear that their anti-political restructuring principle applies equally in the religious context.

## II.    The political-process doctrine applies to religious discrimination.

The district court erred when it concluded that the political-process doctrine does not extend beyond the context of racial discrimination. R.39, Op. 8, PageID.283. Race and religion are both suspect classifications, *e.g.*, *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976) (recognizing that rational-basis review does not apply to "inherently suspect distinctions such as race, *religion*, or alienage" (emphasis added)), so there is no principled basis to treat them differently for purposes of equal protection analysis.

Indeed, courts—including the Supreme Court—have recognized that the political-process doctrine applies to more than racial discrimination. Take *Hunter*. The Akron charter amendment at issue applied not just to ordinances targeting racial discrimination but also to those targeting discrimination on the basis of religion and national origin. 393 U.S. at 386–87. Although some of the Court's language focused on the racial aspects of the amendment, its opinion makes clear that the charter amendment's constitutional infirmities were broader than that. The Court repeatedly emphasized that while the law applied equally to black and white people and "Jews," "Catholics," and "gentiles," "the reality is the law's impact falls on the minority." *Id.* at 390–91; *accord id.* at 395 (Harlan, J., concurring) ("Here, we have a provision that has the clear purpose of making it more difficult for certain racial *and religious* minorities to achieve legislation that is in their interest." (emphasis added)). The Court described the ordinance's problems as drawing a "distinction between those groups who sought the law's protection against racial, *religious*, or ancestral discrimination in the sale and rental of real estate and those who sought to regulate real property transactions in the pursuit of other ends." *Id.* at 390. And the

Court cast its holding broadly—in terms of any protected class: "[T]he State may no more disadvantage *any particular group* by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give *any group* a smaller representation than another of comparable size." *Id.* at 393 (emphasis added).

A couple of years later, the Supreme Court again explained that the political-process doctrine can extend beyond racial classifications in *Gordon v. Lance*, 403 U.S. 1 (1971). At issue were West Virginia constitutional and statutory rules precluding political subdivisions of the state from incurring bonded debt absent a 60 percent vote of the electorate. 403 U.S. at 2. There was no indication the rules related to racial discrimination. If *Hunter* were only about race, that would have been enough. But the Court distinguished *Hunter* on a different basis: "The class singled out in *Hunter* was clear—'those who would benefit from laws barring racial, religious, or ancestral discriminations,'" whereas no "independently identifiable group or category" would benefit from bonded debt. *Id.* at 5. "Consequently, *no sector of the population* [could] be said to be 'fenced out' from the franchise because of the way they will vote," and *Hunter* did not apply. *Id.* (emphasis added).

Then, in *Seattle*, the Court reaffirmed the obvious implications of *Hunter* itself. Summarizing the political-process doctrine, the Court noted that "the political majority may generally restructure the political process to place obstacles in the path of everyone seeking to secure the benefits of governmental action." 458 U.S. at 470. "But a different analysis is required when the State allocates governmental power nonneutrally," thereby "making it *more* difficult for certain racial *and religious minorities* than for other members of the community to achieve legislation that is in their interest." *Id.* (quoting *Hunter*, 393 U.S. at 395) (cleaned up, second emphasis added).

## III. The Blaine Amendment's facial neutrality does not save it given the Michigan Supreme Court's holding that the Blaine Amendment was passed for antireligious reasons.

The district court also discounted Appellants' equal protection claim because the Blaine Amendment is facially neutral. R.39, Op. 8, PageID.283. But just as in the free exercise context,[3] the Supreme

---

[3] *E.g.*, *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2422 (2022) ("A plaintiff may . . . prove a free exercise violation by showing that 'official expressions of hostility' to religion accompany laws or policies burdening religious exercise; in cases like that we have 'set aside' such policies without further inquiry." (quoting *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719, 1732 (2018))); *Church of the*

Court has made clear that facial neutrality does not give the government a free pass in the equal protection context. Where, like here, discrimination motivated a facially neutral enactment, the enactment violates the equal protection clause.

Consider first the cases underlying the political-process doctrine. In *Hunter* and *Seattle*, the challenged enactments were also facially neutral. *Seattle*, 458 U.S. at 471 ("[D]espite its facial neutrality there is little doubt that the initiative was effectively drawn for racial purposes."); *Hunter*, 393 U.S. at 391 ("[A]lthough the law on its face treats Negro and white, Jew and gentile in an identical manner, the reality is that the law's impact falls on the minority."); *see also Reitman v. Mulkey*, 387 U.S. 369, 371 n.2 (1967) (quoting the enactment at issue). That facial neutrality did not stop the Supreme Court from subjecting the enactments to further scrutiny and ultimately concluding that they violated the Equal Protection Clause.

---

*Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534 (1993) ("Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality.").

Even outside the political-process-doctrine context, the Supreme Court has made clear that "a classification that is ostensibly neutral but is an obvious pretext" for purposeful discrimination against a suspect class "is presumptively invalid." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 272 (1979) (collecting cases). "[S]tatutes are subject to strict scrutiny under the Equal Protection Clause not just when they contain express . . . classifications, but also when, though . . . neutral on their face, they are motivated by a [discriminatory] purpose or object." *Miller v. Johnson*, 515 U.S. 900, 913 (1995); *see also Hunter v. Underwood*, 471 U.S. 222, 229 (1985) (holding that a facially neutral state constitutional amendment violated the Equal Protection Clause because "delegates to the all-white convention were not secretive about their [discriminatory] purpose").

"Determining whether invidious discriminatory purpose was a motivating factor" of a law or government action "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977). This sensitive inquiry requires looking at the effect of the law, the "historical background of the decision" giving rise

to it, and the "legislative or administrative history" of the law's enactment. *Id.* at 266–68; *see also Lukumi*, 508 U.S. at 540 ("Relevant evidence includes, among other things, the historical background of the decision under challenge, the specific series of events leading to the enactment or official policy in question, and the legislative or administrative history, including contemporaneous statements made by members of the decisionmaking body.").

Here, evaluation of the Michigan Blaine Amendment's purpose has already been made, with the Michigan Supreme Court having determined—contemporaneously—that the amendment was motivated by religious bias and targeted at religious schools and families. That court held the facially neutral Blaine Amendment to be "an anti-parochiaid amendment." *Parochiaid*, 566 N.W.2d at 220–21 (quoting *Traverse City*, 185 N.W.2d at 17 n.2); *see also Traverse City*, 185 N.W.2d at 17 n.2 ("The news media and even the active supporters and opponents of Proposal C referred to it as the 'Parochiaid Proposal.' Everyone agreed the proposed amendment was designed to halt parochiaid and would have that effect if adopted."). Given the amendment's purpose, the Michigan Supreme Court also unsurprisingly concluded that its

impact falls almost exclusively on "church-related schools." *Traverse City*, 185 N.W.2d at 29 ("[W]ith ninety-eight percent of the private school students being in church-related schools the 'impact' is nearly total."). This Court should defer to the Michigan Supreme Court's determination of the Blaine Amendment's purpose. *See, e.g.*, *Mulkey*, 387 U.S. at 381 (deferring to the California Supreme Court's characterization of the California enactment at issue).

Even if the Michigan Supreme Court had not already resolved the question, the historical record of the lead up to and passage of the Blaine Amendment recited in Appellants' complaint illustrates its anti-religious purpose. Much like in *Hunter* and *Seattle*, those seeking a modicum of public funding for parents to send children to parochial schools achieved modest legislative victories in the 1960s and 1970. R.1, Compl. ¶¶ 65, 71, 82, PageID.15–17. But just as religious parents who decided to send their children to religious schools were to receive some legislative support in educating their children, the Council Against Parochiaid swept in and successfully advocated passage of a constitutional amendment—the Blaine Amendment—that took away that gain

and placed an additional restriction on religious parents' ability to ever achieve such a gain again. *Id.* ¶¶ 87–94, PageID.18–23.

Those who spearheaded Michigan's Blaine Amendment were not subtle about their purposes. They did not name their group the "Public School Initiative" but the "Council Against Parochiaid," intentionally choosing a religiously loaded term for their advocacy group's name. *Id.* ¶¶ 88–89, PageID.18. And when advocating for the passage of Michigan's Blaine Amendment, they doubled-down on their antireligious motives. *See id.* ¶ 92, PageID.19–23 (describing the antireligious rhetoric used to advocate for the Blaine Amendment).

What's more, at the time Michigan's Blaine Amendment was passed, 218,000 of the 275,000 nonpublic students in Michigan were enrolled in Catholic schools. *Id.* ¶ 84, PageID.18. The next largest nonpublic system was the National Union of Christian Schools of the Christian Reformed Church. *Id.* ¶ 85, PageID.18. In other words, "nonpublic schools" were synonymous with parochial, i.e. religious schools. *Id.* ¶ 86, PageID.18.

In light of the Michigan Supreme Court's characterization of the Blaine Amendment's purposes and the extensive evidence in the

historical record, it is beyond reasonable dispute that the Blaine Amendment was adopted "at least in part 'because of,' not merely 'in spite of,' its adverse effects" on religious people. *Feeney*, 442 U.S. at 279; *see also Hunter*, 471 U.S. at 232 ("[A]n additional purpose to discriminate against poor whites would not render nugatory the purpose to discriminate against all blacks, and it is beyond peradventure that the latter was *a* 'but-for' motivation for the enactment of § 182." (emphasis added)). That is sufficient to establish an equal protection violation.

## IV.    The Blaine Amendment restructured Michigan's political system in a way that disadvantages religious people.

Finally, it is beyond dispute that the Blaine Amendment "imposes direct and undeniable burdens" on minority religious interests. *Seattle*, 458 U.S. at 484. Not only did the Blaine Amendment undo the modest legislative victories parochial-school supporters obtained in the 1960s, it imposes a likely insurmountable burden on all future attempts to obtain similar relief from the Michigan Legislature. No longer may religious people and schools lobby their state representative or state senator for governmental aid or tuition help, like public-school and

secular private-school parents.[4] Rather, they must undertake the onerous and expensive process of securing signatures and passing a state constitutional amendment.

It would be one thing had Michigan simply repealed existing laws supporting parochial schools. There are winners and losers in the democratic process, and religious and other minorities often get the short end of the stick. But a state goes too far when it requires laws protective of minorities to go through a more onerous approval procedure than other laws. That is what Michigan's Blaine Amendment does, and it therefore violates the Equal Protection Clause.

## CONCLUSION AND REQUESTED RELIEF

*Hunter* and *Seattle* make clear that a state cannot place a "political restriction" on religious parents—because of their religion—and make it more difficult for them than other parents to advocate for public benefits. It violates equal protection for a state's constitution to be used to purposely inflict an injury on a suspect class. That is what

---

[4] As noted earlier, Michigan provides mechanism for private, secular schools to obtain public funding by seeking charter-school status. *See generally* Mich. Comp. Laws § 380.502. Private religious schools are denied that same choice. R.1, Compl. ¶ 138, PageID.31.

the Michigan Blaine Amendment did and continues to do, and it is why the Court should reverse the district court's dismissal of Count IV of Appellants' complaint and remand with instructions to enter judgment in favor of Appellants on that count.

Dated: January 23, 2023

*/s/ John J. Bursch*
John J. Bursch
Bursch Law, PLLC
9339 Cherry Valley SE, Suite 78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Patrick Wright
Mackinac Center Legal Foundation
140 West Main Street
Midland, Michigan 48640
(989) 631-0900
wright@mackinac.org

Attorneys for Plaintiffs-Appellants

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief complies with the type-volume limitation pursuant to Fed. R. App. P. 32(a)(7)(B). The foregoing brief contains 8,730 words of Century Schoolbook 14-point proportional type. The word processing software used to prepare this brief was Microsoft Word 2016.

Dated: January 23, 2023

*/s/ John J. Bursch*
John J. Bursch
Bursch Law, PLLC
9339 Cherry Valley SE, Suite 78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Attorneys for Plaintiffs-Appellants

# CERTIFICATE OF SERVICE

This certifies that Appellant's Brief was served on January 23, 2023, by electronic mail using the Sixth Circuit's Electronic Case Filing system on all counsel of record.

/s/ John J. Bursch
John J. Bursch
Bursch Law, PLLC
9339 Cherry Valley SE, Suite 78
Caledonia, Michigan 49316
(616) 450-4235
jbursch@burschlaw.com

Attorneys for Plaintiffs-Appellants

## DESIGNATION OF RECORD

| Doc. Entry No. | Date Entered | Page ID Range | Description of Doc. |
|---|---|---|---|
| R.1 | 09/23/21 | 6–34 | Complaint |
| R.13 | 11/04/21 | 104–106 | State's Brief in Support of Its Motion to Dismiss |
| R.39 | 09/30/22 | 283–284 | Opinion |
| R.40 | 09/30/22 | 285 | Judgment |
| R.41 | 10/28/22 | 286 | Notice of Appeal |